UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER CHESNUT, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CHICAGO PUBLIC SCHOOLS, )<br>)<br>Defendant. ) | No. 23 CV 4230<br><br>Magistrate Judge Young B. Kim<br><br>November 26, 2024 |

**MEMORANDUM OPINION and ORDER**

Plaintiff Christopher Chesnut brings this six-count lawsuit against Defendant Chicago Public Schools ("CPS")[1] alleging national origin and reprisal discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the Illinois Civil Rights Act, 740 ILCS 23/5 ("ICRA"), and the Civil Rights Act of 1886, 42 U.S.C. § 1981 ("Section 1981"). Before the court is CPS's motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is granted as to Counts III and IV with prejudice but denied as to Counts I, II, V, and VI:

**Background**

For purposes of ruling on CPS's motion to dismiss, the court accepts as true all well-pleaded facts in the amended complaint and draws all reasonable inferences in

---

[1] The proper name for Defendant is the Board of Education of the City of Chicago. However, for the sake of consistency, the court refers to the Board in this opinion as "CPS," because Chesnut names the "Chicago Public Schools" as Defendant in his amended complaint. (See R. 21, Amend. Compl.)

Chesnut's favor. *See Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016). Chesnut is of Lebanese national origin, who CPS hired in February 2011 as a substitute teacher. (R. 21, Amend. Compl. ¶¶ 7, 12, 15.) Later that same year, CPS assigned Chesnut to temporarily serve as a Spanish teacher at Taft High School ("Taft"), but eventually assigned him to teach at Taft on a full-time basis. (Id. ¶¶ 7, 12.) In the fall of 2019, Chesnut transferred to Taft's Freshman Academy ("Academy") as a Spanish teacher. (Id. ¶¶ 2, 14, 17.) Chesnut alleges that he suffered national origin and reprisal discrimination while teaching at the Academy. (Id. ¶¶ 2-3.)

More specifically, Chesnut says his coworkers at the Academy excluded him from chaperoning study abroad trips and other Foreign Language Department functions. (Id. ¶¶ 17-18.) He also alleges that on the first day of the 2019 fall semester, Lisa Wagner, a special education teacher at the Academy, laughed at him and declined his request to sit next to her at a presentation. (Id. ¶ 19.) Wagner then took photos—he does not say of what—and sent them to a Facebook group chat entitled, "Chat without Chris." (Id.)

Following this incident, Chesnut spoke with his former Department Chair, Kerstan Crowe, who drafted and submitted a written complaint on his behalf ("2019 Internal Complaint") to the new Department Chair, Nuvia Alanis, about Chesnut's situation at the Academy. (Id. ¶ 20.) Alanis then forwarded this complaint to Taft administrators, who in turn referred it to the CPS Equal Opportunity Compliance Office ("EOCO"). (Id.)

2

When Wagner approached Chesnut about the 2019 Internal Complaint, Chesnut told her that he felt he was being excluded from group activities by her and other teachers. (Id. ¶ 21.) Wagner allegedly responded, "[t]o tell you the truth, since 9/11 I've carried a bullet-proof plate in my purse." (Id.) Chesnut says that Wagner's comment referred to his Middle Eastern background and implied that she viewed him as a "terrorist." (Id. ¶ 22.) In February 2020 EOCO determined that the 2019 Internal Complaint did not involve a protected class issue but recommended that Taft administrators address the complaint, nonetheless. (Id.)

Thereafter, Chesnut says that CPS and his coworkers retaliated against him in various ways for filing the 2019 Internal Complaint. More specifically, Chesnut alleges that he stayed home on sick leave from January 11 through January 14, 2022, while experiencing COVID-19 symptoms, but CPS retracted his sick leave status without explanation and, as a result, Chesnut did not receive sick pay for this absence until he filed a grievance with the Chicago Teacher's Union ("Union"). (Id. ¶ 24.) Chesnut next alleges that CPS violated its collective bargaining agreement with the Union ("CBA") when he returned from his sick leave on January 18, 2022, by assigning him to substitute teach at 8:00 p.m. the following evening. (Id. ¶ 25.) Chesnut fulfilled the request to substitute teach without additional pay, but CPS accused him of insubordination for challenging the improper assignment. (Id. ¶¶ 3, 26.) In response, Chesnut contacted Dr. Laura Lemone, CPS's Network Chief, to schedule a meeting to address what he considers to have been retaliatory behavior.

3

(Id. ¶ 27.) However, on January 28, 2022, and before Chesnut could meet with Dr. Lemone, CPS suspended him indefinitely with pay. (Id. ¶ 28.)

Chesnut also alleges that coworkers lodged two retaliatory complaints against him. (Id. ¶¶ 23, 29.) First, Wagner complained to CPS on January 28, 2022, the day CPS suspended him, that Chesnut verbally threatened an assistant principal during the previous school year and demonstrated hostile behavior toward staff members and students, and that another teacher referred to Chesnut as a "school shooter." (Id. ¶ 29.) The amended complaint does not indicate what if any bearing Wagner's complaint had on his suspension that began that same day. Second, Wagner, or another CPS employee, filed a false police report against him the day after her internal complaint based on the same allegations. (Id. ¶ 32.)

Chesnut remained on paid suspension for 15 months while CPS investigated Wagner's complaint, the police report, and the alleged insubordination concerning the substitute teaching assignment. (Id. ¶¶ 28, 35.) During that time, Chesnut reported the alleged retaliatory conduct to the EOCO, filed multiple union grievances, and attempted to file a CPS Law Department ethics complaint. (Id. ¶¶ 39-41.) CPS eventually lifted his suspension in April 2023, but Chesnut alleges that he could not return to the Academy because of the "besmirching of his reputation and hostile environment." (Id. ¶¶ 35, 38, 42.) Instead, in settling one of his union grievances, Chesnut agreed to return to the unassigned teacher pool, resulting in a loss of his tenure status at the Academy. (Id. ¶¶ 42-43.) And because CPS failed to reassign

4

Chesnut to another permanent, full-time position, his employment with CPS ended in April 2024. (Id. ¶¶ 43-44.)

## Analysis

A Rule 12(b)(6) motion to dismiss challenges the sufficiency of the complaint, not its merits. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). The complaint must assert a plausible claim on its face and provide fair notice of that claim's basis to the defendant. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728-29 (7th Cir. 2014). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Here, CPS moves to dismiss the amended complaint in its entirety, arguing that: (1) portions of Chesnut's Title VII claims (Counts I and II) are time barred; (2) portions of Chesnut's Title VII claims are outside the scope of his Equal Employment Opportunity Commission ("EEOC") charge of discrimination; (3) Chesnut fails to allege an adverse employment action to support his Title VII discrimination claim (Count I); (4) he does not plead the required elements for his retaliation claim (Count II); (5) he cannot bring a Section 1981 claim against CPS as a state actor (Counts III and IV); and (6) his ICRA claims (Counts V and VI) fail for the same reasons as his Title VII claims. (See R. 30, Def.'s Mot.) The court addresses each argument in turn.

**A.      Timeliness**

CPS argues that any alleged discriminatory or retaliatory acts from 2019 are time-barred. (Id. at 4.) Before bringing a Title VII action, a plaintiff must file an EEOC administrative charge within 300 days of the alleged unlawful employment practice. *Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 744 (7th Cir. 2021). Discrete discriminatory or retaliatory acts that fall outside that 300-day period are considered untimely. *Id.* In this case, Chesnut filed his EEOC charge on August 10, 2022. (R. 21, Amend. Compl. ¶ 9.) Thus, any discrete discriminatory or retaliatory conduct for which Chesnut seeks to recover must have occurred on or after October 14, 2021, to be actionable.

Chesnut relies on eight alleged adverse employment action to support his Title VII discrimination and retaliation claims (Counts I and II): (1) subjecting him to a hostile work environment; (2) canceling his sick leave; (3) assigning him to substitute teach without adequate notice; (4) removing him from his teaching position; (5) filing a false police report against him; (6) failing to promptly investigate Wagner's false claims against him; (7) eliminating his tenure status; and (8) failing to assign him to another permanent teaching position. (R. 21, Amend. Compl. ¶¶ 49, 55.) Except for the hostile work environment charge, these alleged discrete adverse employment actions occurred after January 2022. As such, the alleged incidents of alleged discrimination enumerated above are not time barred.

As for his hostile work environment claim, Chesnut refers to "continued retaliation," "[a] continuation of . . . discriminatory and retaliatory behavior," "continued invocation of discriminatory stereotypes," and "[a] hostile environment

6

that [Chesnut] faced from both co-workers and administration," (R. 21, Amend. Compl. ¶¶ 27, 37, 42.) CPS argues that Chesnut improperly attempts to amend his complaint to include a "new theory of liability" in his response, (R. 38, Def.'s Reply at 2), but the allegations in the original complaint show otherwise, (R. 1, Compl. ¶¶ 12, 13; R. 21, Amend. Compl. ¶¶ 27, 37, 42, 49, 55.) And while CPS is correct that Chesnut cannot evade the time limitations imposed by Title VII, hostile work environment claims are distinct from claims of discrete discriminatory acts in that they rely on repetitive or continuing acts. *Adams*, 742 F.3d at 730 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111-14 (2002)). As such, "a hostile-work-environment charge is timely so long as '*any* act falls within the statutory time period.'" *Id.* (citing *Morgan*, 536 U.S. at 111-14 (emphasis in original)). Beyond that, while discrete acts occurring outside the statutory time period cannot form the basis for liability, such acts are allowed as "support for a timely claim." *West v. Ortho-McNeil Pharm. Corp.*, 405 F.3d 578, 581 (7th Cir. 2005) (citing *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 786 n.4 (7th Cir. 2004)); *Morgan*, 536 U.S. at 113 (finding that Title VII does not "bar an employee from using the prior acts as background evidence in support of a timely claim"). Thus, CPS's motion is denied to the extent Chesnut relies on events before October 14, 2021, to support a hostile work environment claim that continues thereafter or serve as background for evidence to support his Title VII claims more broadly.

## B. Charge Scope

CPS next argues that Chesnut's amended complaint alleges new conduct not described in his EEOC charge, including: (1) the retraction of his sick leave; (2) the improper substitute teaching assignment; (3) the false police report; (4) the removal of his tenure status; and (5) the failure to rehire him. (R. 30, Def.'s Mot. at 5.) Generally, a plaintiff may not recover for Title VII claims not included in an EEOC charge. *See Bilal v. Rotec Indus.*, 326 Fed. Appx. 949, 953 (7th Cir. 2009); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002) (citations omitted). However, claims not explicitly mentioned in an EEOC charge may be permitted in federal court if they are "like or reasonably related" to the allegations in the EEOC charge and can reasonably expect to grow out of an EEOC investigation. *Harper*, 45 F.3d at 147-48 (citing *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992)). Indeed, because plaintiffs usually draft EEOC charges without the benefit of an attorney, courts must define their scope liberally, and a plaintiff need not include every fact, individually or in combination, that forms the basis of his federal claims. *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 831 (7th Cir. 2015) (citations omitted).

Furthermore, neither the EEOC rules governing the construction of charges nor notice pleading standards require a detailed elaboration of every event underlying a plaintiff's claim. *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 639 (7th Cir. 2004) ("[The plaintiff] set forth a terse explanation of the March 2000 meeting, which was all he was required to do." (citing 29 C.F.R. § 1601.12(a)-(b)

8

("An EEOC charge should state a "clear and concise statement of the facts, including pertinent dates" but is valid if it is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of."))); *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002) ("All that need be specified [in a plaintiff's complaint] is the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer.").

Here, Chesnut included in his EEOC charge that he was "subjected to harassment based on [his] national origin" and that he experienced "retaliation for engaging in protected activity." (R. 21, Amend. Compl. Ex. 1.) Specifically, Chesnut alleges that he suffered a denial of benefits, discipline, and temporary reassignment after complaining to CPS on numerous occasions. (Id.) Construing the charge and the amended complaint liberally and drawing all inferences in his favor, Chesnut's EEOC charge reasonably put CPS on notice of his grievances by generally describing the alleged unlawful employment acts or practices—specifically, the allegations of discrimination and retaliation based on his national origin. *See Huri*, 804 F.3d at 832 (finding EEOC charge citing "harassment" was reasonably related to Title VII hostile work environment claim). Chesnut was not required to include anything beyond these general descriptions in his EEOC charge. Accordingly, his Title VII claims fall within the scope of his EEOC charge, and CPS's motion to dismiss on this basis is denied.

## C. Adverse Employment Action

CPS asserts that Chesnut fails to plead an adverse employment action to maintain a viable Title VII discrimination claim. (R. 30, Def.'s Mot. at 5-6.) Chesnut identifies the same eight alleged adverse employment actions discussed above. (R. 21, Amend. Compl. ¶ 49.) To survive a motion to dismiss, Chesnut need only "allege enough facts to allow for a *plausible* inference that [an] adverse action suffered was connected to [his] protected characteristics." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022) (emphasis in original). Recently, the United States Supreme Court in *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024), clarified that a plaintiff alleging discrimination need not show that an employer's action was "serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." Instead, a plaintiff need only allege some disadvantageous harm "respecting an identifiable term or condition of employment," which leaves the plaintiff "worse off" but not "significantly so." *Id.* at 354-59; *see also Thomas v. JBS Green Bay, Inc.*, No. 24-1404, 2024 WL 4719251, at *1 (7th Cir. Nov. 8, 2024) ("Decisions requiring allegations of 'significant' or 'material' injury did not survive *Muldrow*."). Such harms include:

> (1) diminishing an employee's compensation, fringe benefits, or other financial terms of employment, including termination; (2) reducing long-term career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted; and (3) changing the conditions in which an employee works in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment.

10

*Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (internal quotations omitted). Decisions concerning hiring, failing to promote, and reassignment with different responsibilities also impact terms and conditions of employment and may be actionable. *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)). And post-*Muldrow*, the Seventh Circuit made clear that deferred training, denial of a preferred vacation schedule, and a transfer to a different shift may also constitute adverse employment actions to support a Title VII discrimination claim. *Thomas*, 2024 WL 4719251, at *1.

Here, drawing all reasonable inferences in Chesnut's favor, he pleads several plausible adverse employment actions for purposes of his Title VII discrimination claim, including: (1) the removal from his permanent teaching position; (2) the reassignment to the unassigned teacher pool; (3) the failure to reassign him to a permanent teaching position; (4) the submission of a false police report; and (5) the failure to promptly investigate Wagner's false claims against him. Indeed, CPS took over 15 months to investigate the claims Wagner made against Chesnut, during which time he says he was paid but still suffered financial harm, including the loss of the opportunity to earn tuition credit in exchange for mentoring a student teacher. (R. 21, Amend. Compl. ¶¶ 37-38); *see also Lewis v. City of Chi.*, 496 F.3d 645, 654 (7th Cir. 2007) ("An employer's actions which deprived the employee of compensation which he otherwise would have earned clearly constitute adverse employment action for purposes of Title VII." (internal quotations and alterations omitted)). Further, Chesnut alleges that the fact of the police report, allegations of misconduct,

11

subsequent investigations, and "hostile environment" resulted in significant damage to his reputation and career prospects. (R. 21, Amend. Compl. ¶¶ 37-42); *see also Tart v. Ill. Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004) (explaining that adverse employment actions include "reduc[ing] the employee's career prospects," or "objectively creating a hardship" for the employee).

Additionally, without conducting a fact-intensive review of the circumstances surrounding the provisions agreed to when Chesnut settled one of his union grievances, his allegations of transfer to the unassigned teacher pool and loss of tenure status would no doubt qualify as adverse employment actions. To be sure, even though Chesnut accepted the offer to return to the unassigned teacher pool, that agreement was born out of the alleged "hostile environment" and significant reputational damage he suffered after a forced and prolonged suspension. It follows that the subsequent failure to reassign Chesnut from the unassigned teacher pool to another permanent teaching position is also actionable. *See Johnson v. Bd. of Educ. of Chi.*, 796 Fed. Appx. 313, 315 (7th Cir. 2020) ("A failure to hire can, of course, constitute an adverse employment action." (citations omitted)).

Further, while CPS argues that Chesnut's alleged last-minute assignment to substitute teach did not give rise to an actionable adverse employment action, the court disagrees. Indeed, the amended complaint specifically states that Chesnut was denied additional pay. (R. 21, Amend. Compl. ¶ 3.) As discussed, under *Muldrow*, a plaintiff need only allege some disadvantageous harm "respecting an identifiable term or condition of employment," which leaves the plaintiff "worse off" but not

12

"significantly so." 601 U.S. at 359. Chesnut has met that standard here. However, Chesnut cannot cite the retraction of his sick leave, because the amended complaint indicates that he eventually recovered his sick pay and endured no other actionable harm. (R. 21, Amend. Compl. ¶ 24.); *see also Muldrow, 601* U.S. at 359 (to be actionable, employer act must leave plaintiff "worse off").

### D. Retaliation Claim

CPS asks the court to dismiss Chesnut's retaliation claim as a matter of law for failure to plead the required elements. (R. 30, Def.'s Mot. at 7-10.) To state a Title VII retaliation claim, a plaintiff must allege that he "engaged in statutorily protected activity" and suffered an adverse action "as a result of that activity." *Alamo*, 864 F.3d at 555 (citing *Huri*, 804 F.3d at 833). A protected activity is "some step in opposition to a form of discrimination that the statute prohibits." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017). CPS contends that Chesnut does not allege he engaged in statutorily protected activity because he failed to connect his 2019 Internal Complaint with his national origin. (R. 30, Def.'s Mot. at 7.) However, Chesnut alleges that each of his EOCO complaints, complaint to the CPS Law Department, and union grievances constitute protected activity to support his retaliation claim, because he complained of discriminatory treatment through all of them. (R. 21, Amend. Compl. ¶ 54.) Further, the amended complaint details several comments and occurrences upon which it can be inferred that those complaints were based on his national origin, including his co-workers' likening him to a "terrorist," and referring to him as "potentially violent," "a school shooter," and "unstable" based

13

on his Middle Eastern background. (Id. ¶¶ 21-22, 29, 33, 38.) This is sufficient to plausibly connect Chesnut's complaints to his national origin and proceed with discovery at this stage. *See Gaines v. K-Five Constr. Corp.*, 742 F.3d 256, 268 (7th Cir. 2014) ("[A]n employee can engage in statutorily protected activity by complaining about discrimination even if the challenged conduct does not actually constitute discrimination." (citations omitted)).

CPS also complains that Chesnut failed to allege an adverse action to support his retaliation claim. But again, the court disagrees. In the retaliation context, the employer's conduct must be "materially adverse," meaning that "it would dissuade a reasonable employee from engaging in the protected activity," *Williams v. Bd. of Educ. of City of Chi.*, 982 F.3d 495, 509 (7th Cir. 2020) (citation omitted), and "produce[ ] an injury or harm," *Lewis v. Wilkie*, 909 F.3d 858, 868 (7th Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).

For purposes of his retaliation claim, Chesnut asserts the same now-familiar employer actions identified above and in connection with his discrimination claim. (R. 21, Amend. Compl. ¶¶ 49, 55.) Drawing all reasonable inferences in his favor as this court must, the court concludes that the same alleged CPS actions it found supportive of Chesnut's discrimination claim also would dissuade a reasonable employee from complaining about discrimination and otherwise satisfy this retaliation standard.

Finally, CPS argues that Chesnut cannot establish the requisite causal connection between his 2019 Internal Complaint and any adverse acts in 2022.

14

(R. 30, Def.'s Mot. at 10.) However, Chesnut is not required to prove causal connection at the motion to dismiss stage. *Leuvano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1029 (7th Cir. 2013). Given the liberal pleading standard, the court finds that Chesnut sufficiently alleges a plausible retaliation claim.

**E.     Section 1981 Claims**

Chesnut initially also sought relief for discrimination and retaliation under Section 1981. (R. 21, Amend. Compl. ¶¶ 58-68.) However, he retracted those claims after CPS pointed out in its motion that Section 1981 provides a remedy for violations committed by private actors only. (R. 30, Def.'s Mot. at 11); *Campbell v. Forest Preserve Dist.*, 752 F.3d 665, 667 (7th Cir. 2014) (holding that "an injured party must resort to § 1983 to obtain relief for violations committed by state actors" (citations omitted)). Consequently, Chesnut now seeks leave to amend his complaint to include a claim against CPS under Section 1983 instead. (R. 35, Pl.'s Resp. at 11-12.)

Although Federal Rule of Civil Procedure 15(a)(2) provides that after a party has amended its complaint once as a matter of course, the party may again amend its pleading "with the opposing party's written consent or the court's leave," and such leave should be "freely" granted "when justice so requires," a court "may refuse to entertain a proposed amendment" when, as here, "the new pleading would not survive a motion to dismiss." *Gandhi v. Sitara Cap. Mgmt., LLC*, 721 F.3d 865, 869 (7th Cir. 2013). To be sure, a plaintiff can establish municipal liability under Section 1983 only by showing: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that is so permanent and well settled as to

15

constitute a "custom or usage"; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 691 (1978). Additionally, the plaintiff in a Section 1983 case must demonstrate that the municipality was the "moving force" behind the constitutional injury alleged. *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Even if the court construes the operative complaint under Section 1983, Chesnut cannot meet these rigorous standards. He alleges that Wagner, a colleague at the Academy, engaged in discrimination, which CPS investigated. Wagner is not an individual with final policymaking authority and *respondeat superior* liability is not permissible under Section 1983. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022) ("[A] municipality is *not* vicariously liable for the torts of its employees or agents." (emphasis in original)). Chesnut also does not allege a constitutional deprivation as a result of an express CPS policy or widespread practice. Therefore, Chesnut's Section 1981 claims are dismissed and his request for leave to amend to construe them under Section 1983 is denied as futile.

**F.     ICRA Claims**

CPS asks this court to relinquish supplemental jurisdiction over the ICRA claims that duplicate his flawed Title VII claims. (R. 30, Def.'s Mot. at 11; R. 38, Def.'s Reply at 13.) Courts may dismiss claims as duplicative where "the parties, claims, facts, and requested relief are substantially the same." *Bresnahan v. City of Chi.*, No. 18 CV 1974, 2018 WL 4829597, at *17 (N.D. Ill. Oct. 4, 2018) (citations omitted). And if federal claims drop out of a case, leaving only state-law claims, a

16

district court has broad discretion to decide whether to relinquish supplemental jurisdiction over the state-law claims. *RWJ Mgmt. Co. v. BP Prods. N. Am.*, 672 F.3d 476, 478 (7th Cir. 2012).

However, as discussed above, the court does not find the Title VII claims fatally flawed at this stage. Nor will the court dismiss the ICRA claims as duplicative of the surviving federal claims. This court joins others in this district that have found ICRA claims need not be dismissed as duplicative of Title VII claims because the two theories offer different damages caps and adhere to distinct statutes of limitations. *Bresnahan*, 2018 WL 4829597, at *5 ("Title VII damages are capped at $300,000, while damages under the [ICRA] are not."); *see Howard v. Cook Cnty. Sheriff's Off.*, No. 17 CV 8146, 2022 WL 1404833, at *17 (N.D. Ill. May 4, 2022) (holding that overlap with Title VII claim does not require dismissal of an ICRA claim (citations omitted)).

## Conclusion

For the foregoing reasons, CPS's motion to dismiss is granted as to Counts III and IV with prejudice and denied as to Counts I, II, V, and VI.

        ENTER:

        _____
        Young B. Kim
        United States Magistrate Judge